UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| GREGG RITZ<br>&<br>WILD COMMUNICATIONS, LLC<br>    Plaintiff,<br>v.<br>Derek Leininger,<br>    Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.:<br>)<br>)<br>) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES Gregg Ritz and Wild Communications, LLC, by and through their Attorneys, Hoefle, Phoenix, Gormley & Roberts, PLLC, and complains against Derek Leininger as follows:

**PARTIES**

1. Gregg Ritz is an individual residing at 10 Linwood Lane, Stratham NH 03885.

2. Wild Communications, LLC ("WC") is a Delaware limited liability company with a place of business at 2 College Road, #202, Stratham NH 03885.

3. Derek Leininger is an individual residing at 2100 N 1st Street, Seward, Nebraska, 68434.

## JURISDICTION / VENUE

1. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §1332  There exists complete diversity of citizenship between the parties and plaintiff and plaintiff's claim exceeds $75,000, exclusive of interest and costs.  This Court may also exercise supplemental jurisdiction over these claims pursuant to 28 U.S.C. §1367 as they are sufficiently related to the original claims in this action to form part of the same case or controversy.

2.  Venue is appropriate in this district due the parties' contractual agreement as to same and because the impacts of defendant's conduct primarily occurred in New Hampshire.

## BACKGROUND/FACTS

3. Ritz is the principal of WC and both are nationally recognized figures in the outdoor marketing and media sector, primarily relating to hunting.  Ritz is a so-called "celebrity hunter" and, through WC, hosts and creates content for a variety of hunting shows, among other services.

4. Like most aired media, Ritz and WC are heavily dependent upon industry sponsors to underwrite their productions and related activities.

5. Conversely, sponsors insist upon associating with personalities who promote their brand by, *inter alia*, maintaining polished reputations for excellence in their sport as well observance of generally recognized ethical conduct.

6. Among WC's primary sponsors were American Outdoor Brands ("AOB"), Yeti, Thompson Center Arms; Midway, USA; Shadowhunter Blinds; Garmin, and Black Eagle Archery ("the Sponsors")

7. In September 2019, WC contracted with defendant Leininger pursuant to a written employment agreement, by which Leininger agreed to work with WC's sponsors, to assist in marketing (video/photography) and in the creation of content for sale.

8. Leininger was advanced $10,000 for the purchase of video//photography equipment with the stipulation that, if he left WC within two years of the agreement, he would reimburse $5,000 to WC.

9. Also, among his duties was "Farm Management", i.e. managing Ritz's farms and leases for upcoming hunts, setting [tree] stands and cameras to film hunts, preparing for the hunting season, and locating and patterning deer movements.

10. In conjunction with the employment agreement, Leininger executed a "Confidentiality, Non-Competition, And Assignment of Inventions Agreement" ("Agreement").

11. The Agreement provides that the parties "irrevocably submit to the exclusive jurisdiction of the federal and state courts located in New Hampshire for the purposes of any action or proceeding arising out of or relating to [the] Agreement. (Agreement, para. 14).

12. The Agreement prohibits Leininger from competing with WC for six-months post separation, expressly barring product endorsements or attempting to sell any service or product the same or similar to those of WC.

13. It also prohibited Leininger for defaming or disparaging WC's reputation, practices or conduct of the company or its members. (Agreement, para. 7).

14. Among Ritz' undertakings was the creation of "Hunt Masters" television show, the production company for which was Cold Collaborative and for which Leininger served as a production assistant.

15. WC's arrangement with Cold Collaborative provided that it would pay Leininger's compensation.

16. In early 2020, it was learned that Leininger was double billing, i.e., receiving compensation for his work from WC and then separately billing Cold Collaborative for the same efforts.

17. Leininger filmed Ritz harvest a buck on January 1st in Illinois and thereafter told Ritz that he had information that indicated a good chance of killing a mature eight-point buck on property leased by Ritz in Missouri.

18. At Leininger's prompting, Ritz and Leininger drove to Missouri together the following day, during which Leininger told him where on the property they would be hunting and how they enter onto the property.

19. Leininger was completely responsible for the location of the hunt.

20. That same day Ritz in fact shot a deer with sufficient light for Leininger to film the recovery of the carcass and take pictures of same. The deer was legally tagged on the spot using the Missouri Fish and Game application. (Telecheck ID #R600573109).

21. Upon beginning field dressing, Ritz noticed a foul odor, potentially indicating that the deer was diseased. Due to the time of day, he finished the preliminary dressing, marked the location and, to ensure that the carcass was appropriately dealt with, chose to stay locally so that he could return in the morning instead of returning home.

22. The next morning, January 3rd, Leininger and Ritz returned to the property to inspect the deer, after which they agreed that it was obviously spoiled and not suitable for human consumption, and therefore took it into the woods for consumption in the wild.

23. Ritz saw nothing indicating any issue with the hunt, and Leininger never expressed any issues with the hunt that day or during the parties' ride back to Illinois.

24. Cold Collaborative's procedure required that videographers, including Leininger, transfer their footage each day to a master hard drive, which is sent to Cold Collaborative's home office in Austin, TX at the end of each trip.  The videographer's card is wiped clean and formatted for the next day's shoot.

25. Unbeknownst to Ritz, instead of forwarding his footage at the end of the day on January 2nd, Leininger chose to duplicate the footage prior to forwarding it to Cold Collaborative.

26. On or about February 13, 2020, Ritz was contacted by a Missouri Fish and Game officer, advising him that he had been reported for hunting on a baited field on January 2nd. That is, it was alleged that he used feed to unnaturally draw deer to a predetermined spot thereby increasing the odds of drawing a deer and decreasing the challenge in taking same.

27. Harvesting game on a baited field is both illegal and grossly unethical.

28. Having not been in Missouri for several weeks prior to January 2, 2020, Ritz was not advised about the spread of feed in the hunt area, which was outside of the area where there known feed stations and where hunting was therefore prohibited, relying upon Leininger's advice and direction.

29. Upon information and belief, the basis of which is Leininger's duplication of the Missouri hunt footage and Leininger's extensive communications with Missouri Fish and Game agency thereafter, Leininger created the hunt as a method of entrapping Ritz and then promptly posted copies of Ritz's Missouri citations on social media in a manner intended to disparage him.

30. Given his standing in the hunting community, the allegations of blatantly unethical behavior by Ritz spread quickly and the Sponsors promptly cancelled their sponsorship of Hunt Masters.  Ritz has been rendered a pariah in the hunting community with devastating personal and financial consequences.

31. Ritz challenged the Missouri charges and due to, among other things, Leininger's repeated refusal to comply a court-ordered subpoenas for production of documents, and his refusal to testify under oath about the allegations, the charges were dismissed.

32. Moreover, in the interim between the charges and the dismissal, in violation of the Agreement, Leininger has engaged in directly competitive behavior, for example, by working for Heartland Bowhunter, endorsing products on social media and creating content for AOB, presumably utilizing the video and photography equipment purchased with WC's $10,000 advance to him.

33. As a direct and proximate result of Leininger's actions and failures to act, WC lost $400,000 in sponsorships in 2020, and continuing.

34. Additionally, WC had three new television shows in the process of closing $1,500,000 in annual sponsorship revenue, but each prospective sponsor declined to work with WC due to the allegations.

## COUNT I:     FRAUD

35. The foregoing paragraphs are incorporated as though fully restated herein.

36. In inducing Ritz to go to Missouri upon representations as to the presence of game, and by further directing him to a particular location on the property knowing that feed had been spread thereon rendering any hunting illegal, Leininger made false representations, knowing they were false, or he was consciously indifferent to the truth of his allegations.

37. Given Leininger's role within WC and his relationship with Ritz, it was reasonable for Ritz to rely upon Leininger's advice and directions.

38. Leininger undertook the filming and publication of Ritz' unwitting illegal hunt in an effort to discredit him.

39. As a direct and proximate result of Leininger actions, the plaintiffs have suffered significant economic loss and their prospects of reversing the perception of them resulting from Leininger's fraudulent activities continue to impede their ability to sustain and/or grow their business.

## COUNT II:   DEFAMATION

40. The preceding paragraphs are incorporated as though fully set forth herein.

41. Leininger knew that he had created the scenario whereby Ritz was unwittingly caused to hunt on a baited field, rendering false the allegations against Ritz.

42. Moreover, Leininger knew or should have known that such conduct would be catastrophic to Ritz's personal and professional reputation.

43. Despite knowledge of the manufacture of false allegations, Leininger undertook to publish them to a third parties, including the Missouri Fish & Game Department and, after prompting the issuance of false charges, further published those facts on the internet in a manner intended to effect Ritz's and, therefore, WC's reputation.

44. As a direct and proximate result of Leininger's actions, plaintiffs have been damaged in the loss of existing endorsements as well as the likelihood of future endorsements.

## COUNT III:  NEGLIGENCE

45. The foregoing paragraphs are incorporated as though fully restated herein.

46. In promoting and locating a deer hunt for Ritz, and understanding the value of plaintiffs' reputational capital within the hunting community, Leininger had an obligation to ensure that, in acting upon his directions, the plaintiffs would not be put in legal jeopardy.

47. Nonetheless, and despite that obligation, Leininger, whose duties included farm management, directed Ritz to a baited field, recording what he knew or should have known was a baited field, putting Ritz in legal jeopardy.

48. As a direct and proximate result of Leininger's failure to advise Ritz of the actual state of the property being hunted, Ritz was ticketed for violation of legal and ethical hunting restrictions, suffering severe personal and professional losses as a result.

## COUNT IV:   BREACH OF CONTRACT

49. The foregoing paragraphs are incorporated as though fully restated herein.

50. Pursuant to the Agreement, Leininger was prohibited from disclosing WC's proprietary information, from engaging in competitive activities and from disparaging WC and/or Ritz.

51. In direct violation of those undertakings, Leininger undertook to disparage plaintiffs' reputations, allowing him to compete directly with WC, using its proprietary information and equipment to poach its clients.

52. Leininger also failed to reimburse WC the $5,000 owing for video/photo equipment due to his early separation from the company.

53. Leininger also double billed, both collecting a salary/expenses from WC while also billing its production partner, Cold Collaborative, for duplicate costs.

## COUNT V:        INTENTIONAL CONCEALMENT

54. The preceding paragraphs are incorporated as though fully restated herein.

55. As a farm manager, Leininger represented that he had sufficient information about the Missouri property so as to recommend that it could be fruitful for Ritz hunt it.

56. Leininger knew that Ritz had no knowledge as to the current feeding stations on the farm and would rely on him to assure that the hunt was legally conducted.

57. Given his role and knowledge, Leininger knew or should have known where feed was being spread on the property and should have ensured that Ritz was aware of same so that pains could be taken to ensure a legal and ethical hunt.

58. In fact, Leininger revealed to Missouri Fish and Game officials that he had information from cellular cameras demonstrating that, three days prior to the hunt, he knew deer were actually feeding in the area to which he directed Ritz for the hunt, without advising Ritz of same.

59. Leininger undertook to direct Ritz onto the property from a particular perspective to a particular location despite being aware of the risks of hunting in that area and without disclosing same to Ritz.

60. As a direct result of Leininger's concealment, Ritz reasonably believed that he was hunting in a legal manner but, in shooting a deer in the process, was subjected to legal process resulting in significant personal and professional losses.

## COUNT VI:     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

61. The preceding paragraphs are incorporated as though fully restated herein.

62. Leininger, with the knowledge that a field was baited, induced Ritz to hunt thereon, while filming the hung.

63. Leininger knew or should have known that, in the event that Ritz took a deer under those circumstances, he would be subject to criminal and, more importantly, reputational jeopardy.

64. Leininger videotaped and/or photographed evidence of the hunt.

65. Leininger, either directly or through a third party, then reported Ritz to the Missouri Fish and Game Department, knowing that Ritz was innocent, but would cited for hunting violations.

66. Leininger was aware that those violations would have a catastrophic impact on Ritz's business and on him personally and those results ensued.

## **REQUEST FOR JURY TRIAL**

67. Plaintiffs request a jury trial on all issues so triable.

                                Respectfully submitted,

                                GREGG RITZ & WILD COMMUNICATIONS, LLC
                                By and through their attorneys
                                HOEFLE, PHOENIX,
                                GORMLEY & ROBERTS, PLLC

Dated: July 8, 2021                /s/Lawrence B. Gormley
                                Lawrence B. Gormley, Esquire, NH Bar #9999
                                127 Parrott Ave., P.O. Box 4480
                                Portsmouth, NH 03802-4480
                                (603) 436-0666
                                lgormley@hpgrlaw.com